IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SUSAN LIEBERT, ANNA HAAS, ANNA POI, and
ANASTASIA FERIN KNIGHT,

                 Plaintiffs,

   v.

DON M. MILLIS, ROBERT F. SPINDELL,          OPINION and ORDER
MARGE BOSTELMANN, ANN S. JACOBS,
MARK L. THOMSEN, JOSEPH J. CZARNEZKI,       23-cv-672-jdp
MEAGAN WOLFE, MICHELLE LUEDTKE,
MARIBETH WITZEL-BEHL, LORENA RAE
STOTTLER, and WISCONSIN STATE
LEGISLATURE,

                 Defendants.

---

      For more than a century, Wisconsin has allowed voting by absentee ballot in some form. In the beginning, absentee voting was relatively restricted: citizens did not qualify unless they were going to be outside their county "in the course of [their] business" on election day, and the voter was required to prepare the ballot in front of a witness who was authorized to administer oaths. Wis. Stat. §§ 11.54 and 11.58 (1915). Over the years, Wisconsin has expanded absentee voting to more groups, first to people who were ill or disabled, Wis. Stat. § 11.54 (1957), and then, in 2000, to virtually any qualified voter who did not want to vote in person, 1999 Wis. Act 182. Throughout this time, the requirement to have a witness has remained, but now the witness can be any adult U.S. citizen.

      Plaintiffs are four Wisconsin citizens who wish to vote by absentee ballot in the 2024 election, but they do not want to comply with the witness requirement, alleging that it is difficult or inconvenient for them. They contend that the requirement violates two federal statutes, the Voting Rights Act of 1965 and the Civil Rights Act of 1964, and they seek to

permanently enjoin enforcement of the requirement. Plaintiffs' primary theory is that the witness requirement violates the Voting Rights Act because it requires the witness to "vouch" for the absentee voter's qualifications. Alternatively, plaintiffs contend that the requirement violates the Civil Rights Act because it is not "material" to determining the voter's qualifications. Plaintiffs are suing individuals responsible for enforcing the witness requirement, including the members of the Wisconsin Election Commission, the commission's administrator, and three municipal clerks. The Wisconsin State Legislature has intervened as a defendant.

Three motions for summary judgment are before the court, one filed by plaintiffs, Dkt. 63, one filed by the commissioners, Dkt. 58, and one filed by the legislature, Dkt. 64.[1] The municipal clerks neither filed their own motions for summary judgment nor took a position on the other parties' motions.

A witness requirement similar to the one in existence now has been in effect in Wisconsin since the 1960s, around the same time the Voting Rights Act and Civil Rights Act were passed. Despite the many years the two sets of laws have coexisted, no one before now has contended in a lawsuit that the witness requirement was invalid under federal law. The long silence is telling. It may be debatable whether the witness requirement is needed, but it is one reasonable way for the state to try to deter abuses such as fraud and undue influence in a setting where election officials cannot monitor the preparation of a ballot.

Both of plaintiffs' novel claims represent attempts to apply federal voting rights law beyond its proper scope. As for plaintiffs' claim under the Voting Rights Act, it is based on an

---

[1] Plaintiffs also move for leave to respond to supplemental authority cited by the legislature. Dkt. 101. The court will grant that motion and accept the brief attached to it.

unreasonable interpretation of Wisconsin law. Plaintiffs say that Wisconsin law requires the witness to do more than ensure that the voter followed the proper procedure in preparing the ballot; rather, the witness must also certify that the voter is eligible to vote. But that interpretation is inconsistent with the text and purpose of the statute, and it is inconsistent with how the law has been interpreted since it was enacted. Even the plaintiffs themselves do not say in their declarations that they believe they need to find a witness who can certify their qualifications to vote.

As for plaintiffs' claim under the Civil Rights Act, the court concludes that the provision plaintiffs are relying on applies only in the context of an election official's determination whether a person is qualified to vote. Election officials do not use the witness certification for that purpose, so it falls outside the purview of the statute. Plaintiffs' expansive interpretation of the law would lead to arbitrary restrictions on states' authority to regulate elections and threaten any requirement on a voter to provide information on a ballot or related document, including a signature requirement or Wisconsin's requirement that an absentee voter certify that he or she is not voting at another location. Plaintiffs have not identified any reason why Congress would have restricted states in the way plaintiffs propose.

The court will grant defendants' motions for summary judgment, deny plaintiffs' summary judgment motion, and direct the clerk of court to close the case.

BACKGROUND

Under Wisconsin law, "any otherwise qualified elector who for any reason is unable or unwilling to appear at the polling place in his or her ward or election district" may vote by absentee ballot. Wis. Stat. § 6.85(1). But state law requires citizens who wish to vote absentee

to comply with various procedural requirements. One of those requirements is that someone else must witness the voter preparing the ballot. Wis. Stat. § 6.87(2) and (4)(b)1.

Section 6.87(4)(b)1 describes the process of preparing the ballot. First, the voter marks the ballot in the presence of the witness but should not show the witness how she voted. Second, while still in the presence of the witness, the voter folds the ballot, puts it in the envelope, and seals the envelope. *Id.* Third, the voter delivers the envelope to the municipal clerk, either personally or by mail. *Id.*

Section 6.87(2) describes what the voter and witness must certify on the ballot envelope. Underneath their certifications, the voters and witnesses must sign their name. *Id.* Witnesses must also provide their address. *Id.*

If an absentee ballot does not meet all these requirements, the clerk may return the ballot to the voter to correct the defect if there is time to do so. Wis. Stat. § 6.87(9). But if the defect is not corrected, the ballot cannot be counted. Wis. Stat. § 6.84(2).

All four plaintiffs are registered to vote in Wisconsin and plan to vote by absentee ballot in the 2024 election. Susan Liebert lives alone and is "largely confined in her home" because of her "age, health, and disabilities." Dkt. 94, ¶ 17. This means that she generally must arrange for someone to visit her at her home to serve as the witness. Plaintiff Anna Haas plans to be traveling overseas around the time of the November 2024 election, and she will not be traveling with a U.S. citizen.[2] Plaintiff Anna Poi attends college in Minnesota, and she prefers to use another Wisconsin voter as her witness so that she "will be able to locate and rely on the

---

[2] The parties dispute whether Wisconsin law allows a voter in Haas's situation to use a non-U.S. citizen as a witness, but it is not necessary to resolve that dispute to decide the pending motions.

witness if it becomes necessary to cure the certificate." *Id.*, ¶ 33. Plaintiff Anastasia Ferin Knight attends graduate school in Illinois. "[M]any" of the people she knows in Illinois are also graduate students who rely on public transportation, so "arranging a meeting to cast an absentee ballot is a logistical burden." *Id.*, ¶ 40.

## ANALYSIS

### A. Request to stay

Before considering the merits of plaintiffs' claims, the court must address a threshold issue raised by the legislature, which is whether the court should stay this case pending resolution of two other cases that involve different plaintiffs proceeding in state court: *Priorities USA v. Wisconsin Elections Commission*, No. 2023CV1900 (Dane Cty. Cir. Ct.) and *League of Women Voters of Wisconsin v. Wisconsin Elections Commission*, No. 2022CV2472 (Dane Cty. Cir. Ct.). In *Priorities USA*, the plaintiffs are contending that multiple aspects of Wisconsin's absentee voting laws—including the witness requirement—violate the Wisconsin Constitution. Dkt. 74-12. In *League of Women Voters*, the plaintiffs are contending that the requirement on the witness to include his or her address on the absentee-ballot envelope violates the Civil Rights Act. Dkt. 54-1. Plaintiffs and commissioners oppose a stay.

In the order on defendants' motion to dismiss, the court temporarily stayed the case because of the possibility that *Priorities USA* could moot this case or at least provide guidance in interpreting Wis. Stat. § 6.87 and because of concerns about potential conflicts with *League of Women Voters*. Dkt. 56. Based on the new information provided by the parties, the court concludes that no further stay is warranted.

As for *Priorities USA*, recent developments in the case make it unlikely that it will provide any guidance soon. In late January 2024, the circuit court dismissed a facial challenge to the witness requirement. Dkt. 74-12.[3] In reaching that decision, the circuit court did not construe the scope of the witness requirement in § 6.87 but instead rested its decision on the plaintiffs' failure to allege that all voters are harmed by the requirement. The plaintiffs in *Priorities USA* have since filed a notice of appeal and a petition to bypass the court of appeals. Dkt. 74-14. The Wisconsin Supreme Court granted the petition to bypass, but the court is limiting its consideration to a different question: whether § 6.87 precludes the use of drop boxes to return absentee ballots. Dkt. 93-1. This means that it is highly unlikely that the Wisconsin courts will resolve plaintiffs' state constitutional challenge to the witness requirement before the 2024 election.

As for *League of Women Voters*, the court is persuaded that there is no significant risk of conflict or confusion regardless of how this court rules. The state circuit court concluded that the Civil Rights Act prohibited election officials from requiring witnesses to include their address on an absentee ballot envelope. Dkt. 74-9. The claim in this case is a broader challenge to the witness requirement as a whole. So even if this court concludes that the witness requirement is not barred by the Civil Rights Act, it does not affect the state court's order. Plaintiffs and the commissioners agree that the state court's order invalidating the address requirement remains enforceable regardless of what this court rules. Dkt. 82, at 23 and Dkt. 96, at 28. This court agrees with that view. The legislature says that clerks and voters will be

---

[3] The circuit court denied a motion to dismiss a claim challenging the witness requirement as applied to voters who live alone. Dkt. 74-12, at 10–11. But plaintiffs later voluntarily dismissed that claim. Dkt. 74-13.

confused if this court enters an order that conflicts with the state court's order, but the legislature does not explain why. The two cases address different claims, so both orders can be enforced without conflict.

The court will deny the legislature's request for a stay and proceed to the merits.

## B. Voting Rights Act of 1965

The court begins with the text of the relevant portion of the Voting Rights Act:

> (a) No citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State, or local election conducted in any State or political subdivision of a State.

> (b) As used in this section, the term "test or device" means any requirement that a person as a prerequisite for voting or registration for voting . . . prove his qualifications by the voucher of registered voters or members of any other class.

Plaintiffs' theory on this claim is that the witness requirement is invalid because it requires the witness to "vouch" for the voter's "qualifications" by requiring the witness to certify that the voter is entitled to vote.

The parties dispute four issues about this claim: (1) whether it applies only to "discriminatory" regulations; (2) whether the witness requirement in § 6.87(2) and § 6.87(4)(b)1 is "a prerequisite" to voting when voters may avoid the requirement by voting in person; (3) whether the witness requirement requires the witness to "vouch[]" for the voter's "qualifications"; and (4) whether the witness requirement requires the witness to be a "member[] of a . . . class." The court concludes that the witness requirement does not require the witness to vouch for the voter's "qualifications" within the meaning of the Voting Rights Act, so it is not necessary to decide the other disputed issues.

The parties agree that the word "qualifications" in the Voting Rights Act is referring to eligibility to vote. In Wisconsin, voters are eligible if they are at least 18 years old, a resident of the ward where they are voting, a U.S. citizen, competent, and a nonfelon. *See* Wis. Stat. § 6.02 and § 6.03. The parties disagree about the proper interpretation of § 6.87, namely, whether it requires a witness to certify that the voter meets any of those eligibility requirements.[4]

The key dispute is over the interpretation of the portion of § 6.87(2) that describes what the witness must certify. The statute first sets forth in two sentences what the *voter* must certify on the ballot envelope. The first sentence requires the voter to certify that he or she meets the requirements for voting generally and for voting absentee in Wisconsin:

> I, . . . , certify . . . that I am a resident of the [. . . ward of the] (town)(village) of . . ., or of the . . . aldermanic district in the city of . . . , residing at . . . in said city, the county of . . . , state of Wisconsin, and am entitled to vote in the (ward)(election district) at the election to be held on . . . ; that I am not voting at any other location in this election; that I am unable or unwilling to appear at the polling place in the (ward)(election district) on election day or have changed my residence within the state from one ward or election district to another later than 28 days before the election.

Wis. Stat. § 6.87(2). The court will refer to this sentence as the first voter certification.

The second sentence requires the voter to certify that he or she followed the process for preparing the absentee ballot:

> I certify that I exhibited the enclosed ballot unmarked to the witness, that I then in (his)(her) presence and in the presence of no other person marked the ballot and enclosed and sealed the same in this envelope in such a manner that no one but myself

---

[4] The commissioners also contend that that the witness's certification is not "vouching" within the meaning of the Voting Rights Act, regardless of how the word "qualifications" is construed. Dkt. 59, at 27. The court's construction of the scope of § 6.87 renders that argument moot.

8

> and any person rendering assistance under s. 6.87(5), Wis. Stats.,
> if I requested assistance, could know how I voted.

*Id.* The court will refer to this sentence as the second voter certification.

Immediately following the paragraph describing the two certifications of the voter, § 6.87(2) sets forth what the *witness* must certify:

> I, the undersigned witness, subject to [criminal] penalties . . . for false statements, certify that I am an adult U.S. citizen and that the above statements are true and the voting procedure was executed as there stated. I am not a candidate for any office on the enclosed ballot (except in the case of an incumbent municipal clerk). I did not solicit or advise the elector to vote for or against any candidate or measure.[5]

The court will refer to this paragraph as the witness certification.

The dispute is over the phrase "the above statements" in the first sentence of the voter certification. Plaintiffs say that the phrase refers to *all* the above statements in § 6.87(2), that is, both the first and second voter certifications. Defendants contend that the phrase refers only to the *directly* above statements, that is, only the second votrer certification describing the process of preparing the ballot.

If defendants are correct, there would be no violation of the Voting Rights Act. As other courts have held, a witness does not vouch for a voter's qualifications by simply confirming with a signature what he or she observed. *See Thomas v. Andino,* 613 F. Supp. 3d 926, 961 (D.S.C. 2020) ("The Witness Requirement is not a 'test or device' as defined under Section 201 because the requirement does not mandate the witness to 'vouch' or 'prove' that the voter is qualified to vote, but instead is simply required to witness the oath taken by the voter.");

---

[5] If the voter is in the military or is living overseas, the witness does not have to be a U.S. citizen. Wis. Stat. § 6.87(2).

*People First of Alabama v. Merrill*, 467 F. Supp.3d 1179, 1225 (N.D. Ala. 2020) ("The witnesses' signature indicates only that they observed the voter sign the affidavit. As such, the witnesses do not vouch for the voter's 'qualifications.'") (internal quotation marks omitted)). Plaintiffs do not challenge that view. Rather, they contend that *Thomas* and *Merrill* are inapposite because Wisconsin law requires witnesses to certify more than just what they observed; they must also certify everything that is in the voter's first certification, including that the voter is entitled to vote, so witnesses are vouching for the voter's qualifications.

The rules for statutory construction under Wisconsin law are consistent with the rules under federal law. The court begins with the language of the statute, but the court does not review words and phrases in isolation. *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶¶ 45–46, 271 Wis. 2d 633, 681 N.W.2d 110 (2004). Rather, the court must view the words in context, including the surrounding language, the structure of the statute, and any purpose of the statute that is ascertainable from the text itself. *Id.*, ¶¶ 46–49. The court must also interpret the statute to avoid absurd or unreasonable results. *Id.*, ¶ 46.

The phrase "the above statements" is ambiguous in isolation. The statute does not say "all of the above statements," nor does it say "the statements directly above," and it does not otherwise specify which of the above statements the witness must certify. So the court must look to other tools of statutory construction for guidance.

Normally, the court would begin by searching for other textual clues in the statute. But in this case, the most obvious problem with plaintiffs' interpretation is that it simply does not make any sense.

Under plaintiffs' interpretation, every witness would have to determine the voter's age, residence, citizenship, criminal history, whether the voter is unable or unwilling to vote in

person, whether the voter has voted at another location or is planning to do so, whether the voter is capable of understanding the objective of the voting process, whether the voter is under a guardianship, and, if so, whether a court has determined that the voter is competent. *See* Wis. Stat. §§ 6.02 and 6.03. Many witnesses would be unable to independently verify much of the required information. The statute allows any adult U.S. citizen to serve as a witness, suggesting that a wide variety of people should be able to do the job. But only someone with intimate and extensive knowledge of the voter would know his or her criminal history or whether he or she is under a guardianship. And even a close friend or relative would not be able to certify whether the voter has voted at another location or is planning to do so. The witness could ask the voter, but that would defeat the purpose of requiring a certification by another person.

It makes no sense to interpret § 6.87 in a way that would make compliance virtually impossible. If plaintiffs' interpretation were correct, it would mean that countless absentee ballots over decades were invalid because the witness certified that the voter was qualified to vote and met the other requirements in the first voter certification, even though the witness had no basis for such a certification.

Plaintiffs cite no instances of any witness being penalized for failing to confirm a voter's qualifications, and they do not point to any guidance from the Wisconsin Elections Commission or any municipal clerk instructing witnesses that they need to determine a voter's eligibility to vote. Rather, the commission's current instructions for voting absentee explain how to prepare the ballot in front of the witness, but they say nothing about the witness determining voter eligibility. Dkt. 99, ¶ 26.

The absurd results to which plaintiffs' interpretation would lead are reason enough to reject that interpretation. But the text, purpose, and history of § 6.87 also support an

11

interpretation that a witness is required to certify only the statements about the process of preparing the ballot.

**Text.** There are three textual clues. First, the ordinary meaning of a "witness" denotes someone who is relying on personal observations.[6] That is consistent with an interpretation of § 6.87 that requires the witness to certify that the voter properly prepared the ballot. It is not consistent with an interpretation that requires the witness to conduct research or rely on information learned from a third party.

Second, § 6.87(2) includes two separate sentences, each with its own "I certify" clause, identifying what the voter must certify. As already discussed, the first sentence is about the voter's qualifications; the second sentence is about preparing the ballot. If, as plaintiffs contend, the witness certification overlapped completely with both voter certifications, there would have been no need for the legislature to separate those two sentences. The decision to do so suggests an intent to pair the voter's certification that he or she prepared the ballot properly with the witness's certification to do the same.

Third, § 6.87(2) requires the witness to certify that "the above statements are true and the voting procedure was executed as there stated." Plaintiffs contend that the use of the word "and" supports their position. Specifically, they say that the clause "the voting procedure was executed as there stated" refers to the second certification, so "the above statements" must refer to something more than just the second certification or else the clause "the voting procedure was executed as there stated" would be surplusage. Dkt. 68, at 18 (citing *State v. Matasek,* 2014 WI 27, ¶ 18, 353 Wis. 2d 601, 846 N.W.2d).

---

[6]  Merriam-Webster, "witness," *available at*  https://www.merriam-webster.com/dictionary/witness (defining "witness" as "one who has personal knowledge of something").

But the canon against surplusage only goes so far. "[D]rafters of legislation often intentionally err on the side of redundancy as a precautionary measure." *Schutte v. Ciox Health, LLC*, 28 F.4th 850, 862–63 (7th Cir. 2022). The Court of Appeals for the Seventh Circuit, citing Justice Scalia, has referred to this as the "belt-and-suspenders approach." *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 465 (7th Cir. 2020) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 176–77 (2012)). The Wisconsin Supreme Court recognizes the limit as well: "[S]ometimes legislatures do create surplusage and redundancies of language, and therefore the canon against surplusage is not absolute." *Milwaukee District Council 48 v. Milwaukee Cnty.*, 2019 WI 24, ¶ n.10, 385 Wis. 2d 748, 924 N.W.2d 153.

The phrase "the above statements are true and the voting procedure was executed as there stated" is best read as an example of the belt-and-suspenders approach. As already noted, the phrase "the above statements" is ambiguous in isolation. The reference to the "voting procedure" provides context for determining what the witness is certifying. After all, "the above statements" refer to what the *voter* is certifying, and they are written in the first person. Including the clause about "the voting procedure" clarifies that the witness is certifying what the *witness* observed. If, as plaintiffs suggest, the legislature intended the reference to "the above statements" to refer to the voter's qualifications, one would expect the legislature to make such an onerous requirement explicit rather than obscure it with an ambiguous phrase like "the above statements."

**Purpose.** In its statement of policy for the absentee-voting procedure, the legislature wrote that its purposes were to "prevent the potential for fraud or abuse," "to prevent overzealous solicitation of absent electors," and "to prevent undue influence on an absent

elector." Wis. Stat. § 6.84(1). A requirement to obtain a witness when preparing the ballot provides one way to deter some of those potential problems. It would be reasonable to conclude that a person would be less likely to commit fraud or put undue pressure on another voter if a witness must be present and also identify herself.

Plaintiffs identify no purpose it would serve to require a witness to certify a voter's qualifications. Before mailing an absentee ballot to a voter, the municipal clerk must determine that the person requesting the ballot is qualified to vote. *See* Wis. Stat. § 6.96(ar). As already discussed, the witness would not be in a better position than the clerk to make that determination.

**History.** The legislature enacted the current version of the witness requirement in 2000, *see* 1999 Wis. Act 182, but the statute goes back much further. Like the current version, the version of the statute enacted in 1967 required voters to make two certifications—one about their qualifications and one about preparing the ballot—and the statute also required two witnesses or someone authorized to administer oaths to certify that "the above statements are true and the voting procedure was executed as there stated." *See* 1965 Wis. Act. 666. Versions of the absentee-voting law before 1967 also included a witness requirement, but those earlier versions allowed only certain people to be witnesses, usually someone authorized to administer oaths. *See, e.g.*, Wis. Stat. § 11.59 (1915). In those earlier versions of the statute, the witnesses certified only what they observed or personally knew: that the voter followed the required procedure and that the witness did not influence the voter. *See* Wis. Stat. § 11.58 (1915). Only the voter certified that he was entitled to vote. *Id.*

The wording and organization of the absentee-voting law changed in 1967, but there is no indication that the legislature intended to change what the voter and witness were certifying.

Witnesses were still serving the same purpose: to verify that the voter followed the required procedure and was not being unduly influenced.

The bottom line is that the only reasonable interpretation of § 6.87(2) requires a witness to certify that the voter prepared the ballot correctly; it does not require the witness to certify the voter's qualifications. Plaintiffs' arguments to the contrary would lead to absurd results, and they are inconsistent with the text, purpose, and history of § 6.87(2). The court will grant summary judgment to defendants on plaintiffs' claim under the Voting Rights Act.[7]

## C. Civil Rights Act

Plaintiffs' other claim arises under the Civil Rights Act of 1964. Plaintiffs rely on the following provision:

> (2) No person acting under color of law shall . . .
>
> (B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B). The parties and other courts refer to this as the Materiality Provision, so this court will do the same.

---

[7] As already noted, the municipal clerks have not taken a position on any of the issues raised in the parties' summary judgment motions. But even when a party does not move for summary judgment on a particular ground, the district court may grant summary judgment sua sponte to that defendant if: (1) the court is granting summary judgment to another defendant on that ground: (2) the ground would apply equally to the nonmoving defendant; and (3) the plaintiffs had an adequate opportunity to address the ground. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 384–85 (7th Cir. 2008). All of those requirements are met here, and no party contends otherwise, so the court will grant summary judgment to the municipal clerks as well.

Plaintiffs' theory on this claim is based on the following premises: (1) failing to sign the witness certification as required by § 6.87 results in an "error or omission" on the absentee-ballot envelope; (2) the absentee-ballot envelope is a "record or paper relating to any application, registration, or other act requisite to voting"; (3) the witness requirement is not "material in determining whether such individual is qualified under State law to vote"; (4) if the witness does not sign the certification, the vote cannot be counted, which is a "den[ial] [of] the right of any individual to vote." One or both sets of defendants dispute each of these premises.

The court will resolve issues (2) and (3) in defendants' favor. Specifically, the court concludes that the witness requirement does not relate to "any application, registration, or other act requisite to voting," and, even if it did, it is "material" in determining whether a voter is qualified under state law. So the witness requirement does not violate the Materiality Provision, and defendants are entitled to summary judgment.[8] That makes it unnecessary to consider issues (1) and (4).

### 1. Any application, registration, or other act requisite to voting

The parties dispute both procedural and substantive issues on this element of the claim. On procedure, the parties dispute whether the judgment in *League of Women Voters* issue bars defendants from relitigating this issue. On substance, the parties take different views on the scope of the Materiality Provision. The legislature contends that provision applies only to

---

[8] Neither the commissioners nor the municipal clerks took a position on whether that witness requirement relates to "any application, registration, or other act requisite to voting." But the court can grant summary judgment to the commissioners and the clerks on the same ground that the court is granting summary judgment to the legislature. *See Judson Atkinson Candies,* 529 F.3d at 384–85.

determinations regarding whether a person is qualified to vote, so it does not apply to the witness requirement in § 6.87. Plaintiffs' position regarding the scope of the Materiality Provision is less clear, but plaintiffs contend that it applies to the witness requirement. As a matter of statutory interpretation, the question is whether the witness requirement relates to "any application, registration or other act requisite to voting." For the reasons explained below, the court concludes that: (1) the legislature is not barred under the doctrine of issue preclusion from contending that the Materiality Provision does not apply to the witness requirement; and (2) the Materiality Provision does not apply to the witness requirement because it does not relate to "any application, registration, or other act requisite to voting."

   a.  **Issue preclusion**

As already discussed, the plaintiffs in *League of Women Voters* are contending that the Materiality Provision preempts the portion of § 6.87 that requires witnesses to write their address on the ballot envelope. The circuit court agreed with the plaintiffs, and one of its predicate conclusions was that "[t]he Witness Address Requirement is . . . a 'record or paper relating to . . . an act requisite to voting.'" Dkt. 54-1, at 4.

The parties agree that claim preclusion does not apply because plaintiffs in this case are raising a different claim: they are challenging the witness requirement as a whole, not just the requirement to provide an address. But plaintiffs contend that issue preclusion regarding this element of the statute does apply because both the commissioners and the legislature are parties in *League of Women Voters*. Under Wisconsin law, issue preclusion generally applies if the following requirements are satisfied: (1) a factual or legal issue was "actually litigated and determined" in the previous case; (2) the issue was essential to a valid judgment in the previous case; (3) it would not be "fundamentally unfair" to apply preclusion under the circumstances.

*Clarke v. Wisconsin Elections Commission*, 2023 WI 79, ¶ 44, 410 Wis. 2d 19, 98 N.W.2d 370, 391–92.

The parties dispute whether issue preclusion applies to state defendants such as the legislature and the commissioners when the plaintiffs in the previous case were not the same. This is called nonmutual offensive issue preclusion in the case law. *See Michelle T. v. Crozier*, 173 Wis. 2d 681, 688–89, 495 N.W.2d 327, 330–31 (1993). Both sides rely on *Gould v. Department of Health and Social Services*, which appears to be the only Wisconsin case that has considered the issue. 216 Wis. 2d 356, 366–67, 576 N.W.2d 292, 296–97 (Ct. App. 1998). *Gould* was about issue preclusion against state agencies, but all parties assume that *Gould*'s holding also applies to entities such as the legislature and individuals such as the commissioners being sued in their official capacity, so the court will do the same.

*Gould* adopted the reasoning of *United States v. Mendoza*, which held that offensive nonmutual issue preclusion generally was not available against the federal government. 464 U.S. 154 (1984). *Gould* concluded that the same reasons for not applying issue preclusion to the federal government applied to the state government as well. Specifically, the court reasoned that: (1) the state government is more likely than private litigants to litigate the same legal issue against different parties; (2) legal issues in cases involving the government "often have many and complex consequences—for the government and for other individuals"; and (3) applying issue preclusion against the state would require the state to appeal every adverse decision to prevent preclusion. *Gould*, 576 N.W.2d at 298.

Plaintiffs point out that the court of appeals did "not decide whether there are any circumstances that might justify applying the doctrine against a state agency." *Id.* But this appears to be primarily because it was unclear whether *Mendoza* adopted a categorial rule

against nonmutual issue preclusion against the government or allowed for exceptions.[9] *Gould* stated that the reasons for applying issue preclusion "do not, as a general rule, justify the non-mutual offensive application of the doctrine against the agency." *Id.* And the court did not identify any situations in which it would be appropriate to apply nonmutual issue preclusion against the state government. This suggests that applying nonmutual issue preclusion against the government is, at most, the very rare exception to the general rule.

In this case, plaintiffs do not persuasively explain why issue preclusion should apply. As in *Gould*, this case involves issues that could be raised repeatedly in the context of challenges to different statutes, and how those issues are resolved would have important consequences that extend far beyond the litigants. Plaintiffs do not argue otherwise. Instead, plaintiffs say that preclusion should apply because the legislature and the commissioners have appealed the circuit court's decision in *League of Women of Voters*, so any concern about putting undue pressure on defendants to appeal is moot. But even that argument cuts both ways in this case because the appeal in *League of Women Voters* is still pending. *See* Appeal No. 2024AP166. So the final decision in that case remains up in the air, suggesting that it would be premature to preclude the legislature from litigating the issue now. *See Benjamin v. Coughlin*, 905 F.2d 571, 576 (2d Cir. 1990) (concluding that "avoidance of premature estoppel" was one of *Mendoza*'s primary concerns and concluding that estoppel was not premature when the state had already received decisions on the merits from several state courts).

The court will not apply issue preclusion and will proceed to the merits.

---

[9] After *Gould* was decided, the Court of Appeals for the Seventh Circuit stated that it was "likely" that *Mendoza* "intended to create a uniform rule precluding the use of the doctrine [of nonmutual issue preclusion] against the government." *Kanter v. C.I.R.*, 590 F.3d 410, 419–20 (7th Cir. 2009). The Supreme Court has not provided further guidance on the question.

19

b.  **Merits**

The Materiality Provision prohibits a state from denying the right to vote for an "error or omission" on a "record or paper" only if the record or paper relates to "any application, registration, or other act requisite to voting." There's no dispute that an absentee-ballot envelope is not related to a "registration" or an "application." The question is whether the envelope is related to some "other act requisite to voting." This requires a determination of whether preparing the envelope is part of "voting" itself or is an act "requisite" to voting. If preparing the envelope is part of "voting," the Materiality Provision does not apply; if preparing the envelope is an "act requisite to voting," then the provision does apply.

Neither the Supreme Court nor the Court of Appeals for the Seventh Circuit have considered the scope of the Materiality Provision. A handful of other courts have, and they have reached different conclusions. Several courts in older decisions concluded with little discussion that the Materiality Provision applies only to voter registration. *See Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003); *Thrasher v. Illinois Republican Party*, No. 12–cv–4071, 2013 WL 442832, at *3 (C.D. Ill. Feb. 5, 2013); *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1371 (S.D. Fla. 2004); *McKay v. Altobello*, No. 96-3458, 1996 WL 635987, at *1 (E.D. La. Oct. 31,1996). Some treatises likewise state—again with little discussion—that the Materiality Provision is limited to the registration process. *See, e.g.*, Rodney A. Smolla, *Federal Civil Rights Act* § 2:2 (3d ed. 2019); 3 Joseph G. Cook & John L. Sobieski, Jr., *Civil Rights Actions* ¶ 18.01 (2023). In a recent case, the Third Circuit concluded after a lengthy discussion that the Materiality Provision applied only to determinations regarding whether a person is qualified to vote, so a requirement to sign and date an envelope that contains a mail-in ballot falls outside

the scope of the provision. *Pennsylvania State Conference of NAACP Branches v. Secretary Commonwealth of Pennsylvania*, 97 F.4th 120 (3d Cir. 2024) (*Pa. NAACP*).[10]

Other courts have concluded that the Materiality Provision applies more broadly. In *In re Georgia Senate Bill 202,* the court concluded that the Materiality Provision applies to any "voting-related paperwork." No. 21-mi-55555, 2023 WL 5334582, at *10 (N.D. Ga. Aug. 18, 2023). In *La Unión del Pueblo Entero v. Abbott*, the court did not provide a general conclusion about the scope of the Materiality Provision, but the court held that the provision applies beyond the registration process and included applications for mail ballots. No. 21-cv-844, — F. Supp. 3d. — , 2023 WL 8263348, at *18–20 (W.D. Tex. Nov. 29, 2023).

For the reasons explained below, this court concludes that acts "requisite to voting" are limited to those that are part of a process for determining voter qualifications. The witness requirement is not a process for determining voter qualifications, so the Materiality Provision simply does not apply to it.

The court's analysis will be divided into three sections. First, the court will explain why the Civil Rights Act's definition of the word "vote" does not support plaintiffs. Second, the court will explain why it finds the reasoning of *Pennsylvania NAACP* to be persuasive. Third, the court will respond to objections raised by plaintiffs and the dissent in *Pennsylvania NAACP*.

---

[10] The Third Circuit had previously invalidated the same state requirements under the Materiality Provision. *Migliori v. Cohen* 36 F.4th 153, 157 (3d Cir. 2022). But the Supreme Court later vacated that decision as moot, *Ritter v. Migliori*, —— U.S. ——, 143 S. Ct. 297 (2022), so it was not binding in *Pennsylvania NAACP*. Neither *Migliori* nor *Pennsylvania NAACP* are binding on this court, so it comes down to which opinion is more persuasive. The court's discussion of the relevant issue in *Migliori* was limited to a footnote in which the court wrote that the plain language of the Materiality Provision applies to more than just "registration." *Migliori*, 36 F.4th at 163 n.56. But the court did not explain why the provision extends to absentee-ballot envelopes, so *Migliori* is not persuasive. The court will discuss *Pennsylvania NAACP*'s reasoning below.

**Definition of "vote."** In arguing that preparing the envelope is an "act requisite to voting," plaintiffs rely on the definition of "vote" in the Civil Rights Act, which "includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." 52 U.S.C. § 10101(e). If the definition of "vote" is broad, plaintiffs say, then Materiality Provision should be construed broadly too. Cases such as *In re Georgia Senate Bill 202* and *League of Women Voters* relied on the same reasoning.

The problem with plaintiffs' argument is that the Materiality Provision does not apply to a record or paper related to a person's "vote"; it applies to a record or paper related to an "act requisite to voting." Plaintiffs read the word "requisite" out of the statute. Assuming that "vote" and "voting" are intended to have the same scope, a broad definition of what qualifies as "voting" implies a *narrower* definition of what qualifies as an "act requisite to voting." The same act cannot be both "voting" and "something necessary for voting" at the same time. *See Ritter v. Migliori*, 142 S. Ct. 1824, 1826 n.2 (2022) (Alito, J., dissenting from the denial of a stay application) ("It is . . . awkward to describe the act of voting as 'requisite to the act of voting.'").

In addressing this issue, plaintiffs say that "applying the Materiality Provision's protections to the absentee ballot's outer envelope does not conflate acts 'requisite to voting' . . . with the 'act of voting' itself. The act of voting, in its narrow form, is the act of marking a ballot; under Wisconsin law, completing the witness certificate is an act 'requisite' to having that ballot counted." Dkt. 101-1, at 4 (citations omitted). Plaintiffs do not attempt to reconcile this argument with their reliance on the broad definition of "vote." Regardless, the

argument proposes two opposing definitions of "voting" in the same sentence: (1) marking a ballot; and (2) having that ballot counted. Both definitions are problematic for plaintiffs.

As for the first definition, plaintiffs do not explain what principle of statutory construction supports a conclusion that "marking a ballot" is part of "voting," but writing on an envelope after marking the ballot and enclosing it in the envelope is not part of "voting." Marking the ballot occurs *before* preparing the envelope, so how could preparing the envelope be "requisite" to marking the ballot?

As for the second definition, if having a ballot counted is all that qualifies as "voting," then both marking and ballot and preparing a ballot are "requisite to voting." If that is the case, then it means that any mistake on the ballot itself is covered by the Materiality Provision, which would call into question numerous requirements regarding how a ballot must be marked. For example, making a mark in the wrong place, marking more than one candidate for the same office, failing to make any mark, using the wrong type of writing utensil, or even using an unauthorized ballot could all be considered "errors or omissions" that have nothing to do with qualifications. Plaintiffs do not contend that the Materiality Provision would prohibit state officials from rejecting a ballot under those circumstances.

Having said that, it cannot be the case that the acts described in the definition of "vote" and acts "requisite to voting" are mutually exclusive. This is because the definition of "vote" includes "registration or other action required by State law prerequisite to voting." But this does not change the basic problem that an act cannot be both "voting" and "requisite to voting," which raises the question whether the definition of "vote" is intended to have the same scope as "voting" in the Materiality Provision. If that were the intent, Congress could have written the statute to say the Materiality Provision applies to any "application, registration, or

other act of voting" because "voting" would encompass everything in the definition of "vote," including any requisite act.

It might seem surprising that "vote" and "voting" would have a different scope. But it is less surprising when one considers that the word "vote" itself has different meanings in the same statute. For example, Congress used the words "vote" and "voting" in the *definition* of "vote," so Congress must have meant the words to mean different things in different contexts. *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595 (2004) ("The presumption that identical words used in different parts of the same act are intended to have the same meaning . . . is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent."). Moreover, the definition of "vote" pairs "other action required by State law prerequisite to voting" with "registration," and it distinguishes those acts from other "action necessary to make a vote effective," such as "casting a ballot." This suggests that an "act requisite to voting" is not simply anything that happens before a vote is counted, and is something more akin to registration than to casting a ballot.

The bottom line is that the definition of "vote" does not provide the obvious answer to construing the scope of the Materiality Provision, contrary to plaintiffs' suggestion. The court must look to other parts of the statute for further guidance. *See Direct Marketing Ass'n v. Brohl*, 575 U.S. 1, 12–13 (2015) (courts must construe words and phrases in their statutory context). This is where *Pennsylvania NAACP* comes in. The court in that case conducted a thorough analysis of the text, structure, and history and the Civil Rights Act to explain why the court believed that the Materiality Provision is limited to determinations of voter qualifications.

*Pennsylvania NAACP*. The Third Circuit pointed to three textual clues to support its determination that the Materiality Provision does not apply rules about ballot preparation. First, the Materiality Provision applies when an error or omission is not material "in determining" whether a person is qualified to vote. That language must "mean something"; otherwise, Congress could have said that the statute applies when the error or omission is not material "to" a person's qualifications to vote. *Pa. NAACP*, 97 F.4th at 131. By using the words "in determining," Congress was expressing its intent that the Materiality Provision applies only when the state *is* "determining" whether a person is qualified to vote. The state does not use ballots (or envelopes for ballots) to determine a voter's qualifications, so rules about ballot preparation are outside the scope of the Materiality Provision. *Pa. NAACP*, 97 F.4th at 131.

Second, the phrase "other act requisite to voting" must be read in context of the list in which it is included. "Registration" and "application" are both processes for determining voter qualifications. "Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Pa. NAACP*, 97 F.4th at 131–32 (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001)). It follows that the phrase "other act requisite to voting" also refers to processes for determining voter qualifications. *Id.* If Congress had intended a broader interpretation, it could have written the statute as applying to "any record or paper relating to an act requisite to voting," without the reference to "registration" or "application." *Id.* at 138. A broader interpretation of the Materiality Provision reads "registration" and "application" out of the statute. *Id.*

Third, surrounding statutory provisions are limited to the process of determining voter qualifications. The Materiality Provision's section number is 10101(a)(2)(B). Section

10101(a)(2)(A) states that election officials may not use discriminatory standards or practices "in determining whether any individual is qualified under State law or laws to vote in any election." Section 10101(a)(2)(C) restricts the use of literacy tests "as a qualification for voting in any election." It is unlikely that Congress would "sandwich" a broad provision governing all aspects of voting in between two provisions focusing on determining voter qualifications. *Pa. NAACP*, 97 F.4th at 131. Section 10101(a)(2)(A) is particularly probative because it uses the same "in determining" language as the Materiality Provision (§ 10101(a)(2)(B)).[11]

The Third Circuit also provided three reasons beyond the text for why the court believed that a narrower interpretation was more reasonable. First, it is consistent with legislative history suggesting that that the Materiality Provision was intended to prevent interference with registration. The court cited numerous statements in a legislative report that focused on the problem of elections officials disqualifying Black voters because of minor mistakes on registration forms and applications. *Pa. NAACP*, 97 F.4th at 132–33. There were no examples of concerns in the report about rejecting ballots or ballot envelopes for being filled out incorrectly. *Id.*

Second, the court stated that it would make no sense to tie rules for preparing a ballot to voter qualifications. This is because "vote-casting rules . . . serve entirely different purposes than voter-qualification rules." *Id.* at 136. Specifically, voter qualifications are about determining who is entitled to vote; ballot-casting rules are about protecting the integrity of

---

[11] In contrast, § 10101(a)(1) and § 10101(b) apply more broadly. Section (a)(1) states that a citizen has the right "to vote" without regard to race; section (b) prohibits threats, intimidation, and coercion for the purpose of interfering with the right "to vote." Neither section refers to the voter's qualifications or a determination whether the voter is qualified. This is further evidence that the three subsections in § 10101(a)(2) were grouped together because they each have a similar scope.

the voting process, *Id.* At the time voters are preparing and casting their ballots, they have already been deemed qualified, so there would be no reason to evaluate their qualifications again. *Id; see also Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the stay application) ("There is no reason why the requirements that must be met in order to register (and thus be 'qualified') to vote should be the same as the requirements that must be met in order to cast a ballot that will be counted.").

Third, a broader interpretation of the Materiality Provision would mean that numerous rules related to vote casting would be invalid. The court gave examples of signature requirements and rules that disqualify a ballot when it is impossible to determine voter's choice. *Pa. NAACP*, 97 F.4th at 134–35. A failure to sign a mail-in ballot or failure to properly mark a ballot is an "error or omission on any record or paper," and neither mistake is material to determining a voter's qualifications, so both types of rules would be invalid under the Civil Rights Act if the Materiality Provision applied to ballot preparation. *Id.*

The Third Circuit's reasoning is persuasive. It explains why the statute's text, legislative history, and logic all support an interpretation that the Materiality Provision does not apply to ballot preparation.

Judge Shwartz dissented from the majority's holding in *Pennsylvania NAACP*, concluding that the Materiality Provision applies to envelopes used for mailing absentee ballots for the following reasons: (1) the Civil Rights Act defines "vote" broadly; (2) the majority's interpretation renders superfluous the phrase "other act requisite to voting"; (3) the word "any" suggests a broad scope; and (4) a broader interpretation is more consistent with congressional intent. *Pa. NAACP*, 97 F.4th at 146–52. Plaintiffs make many of the same arguments, and

they also contend that the interpretation adopted by the majority in *Pennsylvania NAACP* is simply illogical and makes the Materiality Provision meaningless.

The court has already explained why the broad definition of "vote" is not dispositive, so it is not necessary to discuss that issue again. But the court will address plaintiffs' and the dissent's other objections below.

**Objections to the reasoning in *Pennsylvania NAACP*.** As for the question whether the majority's interpretation renders superfluous the phrase "other act requisite to voting," the dissent's position was that the majority limited the Materiality Provision to the registration process. Some passages from *Pennsylvania NAACP* could be read that way. 97 F.4th at 128 (distinguishing its holding from a previous case holding that "federal law does apply outside the voter registration context"). The majority acknowledged that such a reading could render superfluous the phrase "other act requisite to voting." *Id.* at 138. The court's response to that was that "[s]ometimes, no matter how we read a statute, there will be redundancies." *Id.* (internal quotation marks omitted). Other courts that have limited the Materiality Provision to registration simply ignored the surplusage problem. *See Schwier*, 340 F.3d at 1294; *Thrasher*, 2013 WL 442832, at *3; *Friedman*, 345 F. Supp. 2d at 1371; *McKay*, 1996 WL 635987, at *1.

As already discussed, it is true that the rule against surplusage has limits. *Schutte*, 28 F.4th at 862–63. But there are two other ways of reading the Materiality Provision that reject the "all aspects of voting" interpretation proposed by plaintiffs while still giving meaning to the phrase "other act requisite to voting." Both possibilities are consistent with points that plaintiffs raise.

First, plaintiffs say that the Materiality Provision should not be allowed to disqualify voters for making mistakes simply because a record or paper "was not formally an application

or registration form." Dkt. 101-1, at 3. The court agrees, and that provides one reasonable understanding of the purpose in adding the phrase "or other act requisite to voting." Specifically, it prevents government officials from creating a new voter qualification process and avoiding the requirements of the Materiality Provision simply by calling the process something besides "registration" or "application." Under this view, "other act requisite to voting" serves as a sort of fail-safe against manipulation by election officials.

Second, plaintiffs say that "the process of determining voter qualifications does not necessarily end after the prospective voter submits a registration form or ballot application." *Id.* at 4. As an example, plaintiffs point to Wis. Stat. § 6.79(2)(a), which requires poll workers to review voters' ID to confirm that voters are who they say they are. *Id.* Plaintiffs say that a poll worker is "confirm[ing] the qualifications of in-person voters by examining proof of identification." In other words, plaintiffs' position is that a poll worker checking an ID is "determining whether such individual is qualified under State law to vote in such election" within the meaning of the Materiality Provision.

If plaintiffs are correct, that would give meaning to the phrase "other act requisite to voting." Checking an ID is not part of a "registration" or "application." It would also be consistent with this court's view: the Materiality Provision applies any time an election official determines whether a person is qualified under state law to vote. But the court need not decide for the purpose of this case whether the Materiality Provisions applies to poll workers checking IDs.[12] Plaintiffs' claim is about the failure to properly prepare a ballot envelope, not the adequacy of an ID, and plaintiffs do not contend that election officials use the ballot envelope

---

[12] This court assumed that it did in *Common Cause*, 574 F. Supp. at 636, because no party raised the issue.

to determine whether a voter is qualified. The important point is that the phrase "other act requisite to voting" is not rendered superfluous simply because the court rejects the broadest interpretation of the phrase.

As for the use of the word "any," the Materiality Provision says that it applies to "any record or paper relating to *any* application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). The dissent cited the Supreme Court's statement that "'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind." *Pa. NAACP*, 97 F.4th at 148 (Shwartz, J., dissenting) (quoting U.*S. v. Gonzales*, 520 U.S. 1, 5 (1997). But even "broad language is not limitless." *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007). Regardless of how broadly "any" is construed, it does not assist in determining what acts qualify as "voting" and what acts are "requisite to voting." Rather, the word suggests only that a record or paper is covered by the Materiality Provision *if* it is related to an act requisite to voting.

As for the dissent's belief that a broader interpretation of the Materiality Provision is more consistent with congressional intent, the dissent stated that "Congress's underlying concern was wrongful disenfranchisement," and "Congress's concerns about voter discrimination did not vanish after registration." *Pa. NAACP*, 97 F.4th at 149–50 (Shwartz, J., dissenting). Plaintiffs make a similar point, citing the statement in *Abbott* that a narrow interpretation of the Materiality Provision is inconsistent with "Congress' broader, well-documented aim of eradicating all manner of arbitrary and discriminatory denials of the right to vote" because it could allow denials of the right to vote based on "irrelevant paperwork errors." 2023 WL 8263348, at *21.

There are two problems with this argument. First, as the majority in *Pennsylvania NAACP* pointed out, the dissent failed to cite any legislative history suggesting that Congress was concerned with mistakes on ballots or ballot envelopes when it passed the Civil Rights Act. *Pa. NAACP*, 97 F.4th at 132–33. Rather, that history showed that Congress was concerned with the registration and application process. *Id.* Plaintiffs likewise do not cite any evidence of a broader congressional intent, and they do not contend that Wisconsin's witness requirement bears any relation to the sort discriminatory, arbitrary, and technical rules that were the impetus for the Materiality Provision.

Second, it is true that limiting the Materiality Provision to voter-qualification decisions means that "paperwork errors" on ballots and ballot envelopes—even errors in providing information that furthers no important purpose—fall outside the scope of the provision. But not every statute is intended to cover every problem. The Civil Rights Act of 1964 was one step in a longer journey. The following year, Congress passed the Voting Rights Act of 1965, which more broadly prohibits arbitrary and discriminatory restrictions on voting. For example, the Civil Rights Act prohibits using literacy tests "as a qualification for voting," 52 U.S.C. § 10101(a)(2)(C), and the Voting Rights Act more broadly prohibits the use of "any test or device" to deny someone's "right to vote," 52 U.S.C. § 10501(a). So there is nothing surprising about Congress intending the Materiality Provision to have a targeted scope.

Plaintiffs raise one other issue. Citing *In re Georgia Senate Bill 202*, plaintiffs contend that a narrower interpretation of the Materiality Provision "would essentially render the provision meaningless" because "a state could impose immaterial voting requirements yet escape liability each time by arguing that the very immateriality of the requirement takes it outside the statute's reach." 2023 WL 5334582, at *10. That is simply incorrect. Following

*Pennsylvania NAACP*'s logic does not render the Materiality Provision meaningless. Rather, it leads to a straightforward and sensible rule: when determining whether a person is qualified to vote, the state may not require the person to provide information that is not related to the state's qualifications for voting. That result is consistent with the statutory text as a whole and the legislative history.

It is plaintiffs' interpretation that leads to head-scratching results. Neither plaintiffs nor any of the cases they cite ever explain why rules about preparing or casting a ballot should be limited to verifying voter qualifications. Plaintiffs do not dispute that voter-qualification rules and ballot-casting rules are based on different state interests. Nor do plaintiffs dispute that rules like Wisconsin's witness requirement for absentee ballots are intended to serve legitimate and important purposes, such as deterring voter fraud, undue influence, and ballot harvesting. Instead, plaintiffs say that the state's legitimate interests are simply irrelevant under the Materiality Provision because those interests are not related to proving qualifications. Dkt. 78, at 29. But they identify no reason why Congress would enact a statute that prohibits states from furthering legitimate interests related to protecting election integrity.

In the absence of a clear textual mandate, the court will not infer that Congress intended to impose arbitrary restrictions on states. That would be inconsistent with the Supreme Court's repeated observations that states have substantial authority over the time, place, and manner

32

of voting and a legitimate interest in preventing and deterring abuses such as fraud.[13] If Congress had intended to displace state authority as significantly as plaintiffs suggest, surely there would be clearer indication of that in the text or history of the statute.

All of this leads to one conclusion: the Materiality Provision is inartfully drafted, but the most reasonable reading of it is that it applies only to determinations of a voter's qualifications. By plaintiffs' own assertion, election officials do not use the absentee-ballot envelope to determine a voter's qualifications, so rules governing those envelopes such as the witness requirement fall outside the scope of the Materiality Provision.

The court will grant summary judgment to defendants on plaintiffs' claim under the Civil Rights Act.

### 2. Material in determining whether such individual is qualified

The court has determined that the Materiality Provision does not apply to the witness requirement, so it is not necessary to consider defendants' other arguments. But even if plaintiffs were right that the Materiality Provision does apply to rules governing absentee-ballot envelopes, the court would conclude that the Materiality Provision does not preempt the witness requirement because the requirement is "material" to determining whether a voter is qualified to vote under Wisconsin law.

---

[13] *See, e.g., Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2338 (2021) ("Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) ("The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud.") (internal quotation marks omitted); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) ("States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.").

The court concluded in its discussion on plaintiffs' Voting Rights Act claim that witnesses are not required under § 6.87 to certify a voter's "qualifications." Plaintiffs say that necessarily means that the witness requirement is not material to determining whether a voter is "qualified" to vote under state law. That's incorrect, even assuming that the scope of the term "qualifications" in the Voting Rights Act is the same as the scope of the term "qualified" in the Civil Rights Act.[14] The question whether the witness is certifying a voter's qualifications is distinct from the question whether the witness's certification is "material" to those qualifications.

As already discussed, one of the purposes of the witness requirement is to deter voters from submitting fraudulent votes, that is, submitting a vote in the name of someone else. A witness does not certify whether a person is who they say are, but the presence of the witness and the requirement to certify what the witness observed may help to deter an unqualified voter from using the absentee-voting process to submit a fraudulent vote. In that sense, the witness requirement is a type of safeguard for ensuring that the voter is qualified to vote. That is enough to show that the witness requirement is "material" to whether the voter is qualified.

*Vote.org v. Callanen*, 89 F.4th 459, 489 (5th Cir. 2023), is instructive. In that case, the court considered whether a requirement to use a wet signature on a registration form is material under the Civil Rights Act. The court concluded that it was because a wet signature helps to ensure "that those applying to vote are who they say they are." *Id.* The court's reasoning was

---

[14] In *Common Cause*, the court concluded that the question whether a voter is "qualified" extends beyond "substantive qualifications" such as citizenship, residency, and age, to include requirements such as using an approved form of ID. 574 F. Supp. 3d at 636. Neither side challenges the holding of *Common Cause* in this case, and it is unnecessary to reconsider that decision here because plaintiffs' claim fails regardless of whether the Civil Rights Act is about substantive qualifications only.

that "physically signing the form with the warnings in front of the applicant, threatening penalties for perjury and stating the needed qualifications, has some prospect of getting the attention of many applicants and dissuading false statements that an electronic signature, without these warnings, does not." *Id.* at 488–89. The court acknowledged "criticisms of the effectiveness of an original signature to deter fraud" and that the effect on a registrant of requiring a wet signature "may not be dramatic." *Id.* at 489. But the requirement was material because it "meaningfully, even if quite imperfectly, corresponds to the substantial State interest in assuring that those applying to vote are who they say they are." *Id.*

It is the same in this case. The witness requirement may not be the most effective way to ensure that absentee voters are who they say they are. But it is one reasonable method further that interest in a setting where no election officials or poll workers are present to monitor the process.

Plaintiffs point out that defendants cite no evidence that election officials ever use the witness signature to verify a person's identity, and plaintiffs contend that the Materiality Provision "is most naturally read to ask whether the information at issue is, in fact, used by an election official to determine whether a voter is qualified—it does not ask, more abstractly, whether the information *could be* relevant to qualifications." Dkt. 101-1, at 4 n.2 (emphasis in original). That is a fair point, and it provides further support for the court's conclusion that the Materiality Provision is limited to processes in which the state is determining a potential voter's qualifications. But if plaintiffs are correct that the Materiality Provision applies to all aspects of voting, then it follows that information could be material even when it is not actually used to determine qualifications. Otherwise, the Materiality Provision would prohibit states

from requiring a voter to provide *any* information during aspects of the voting process that do not involve express determinations of qualifications.

If plaintiffs are correct that the Materiality Provision applies to Wisconsin's witness requirement, the court concludes that the requirement is material to determining voter qualifications, and that defendants are entitled to summary judgment on that ground.

CONCLUSION

Plaintiffs say that their circumstances make it more difficult for them to find a witness when preparing the absentee ballot. But under this court's interpretation of Wis. Stat. § 6.87, a witness may be any adult U.S. citizen; plaintiffs are not restricted to witnesses who have personal knowledge of their voting qualifications. And if a voter will be out of the country on election day and will not have ready access to another U.S. citizen, that voter may submit an absentee ballot up to 14 days in advance. Wis. Stat. § 6.86(b). None of the plaintiffs allege that they have been unable to vote in an election for want of a witness.

Regardless of the challenges plaintiffs face, they have not shown that either the Voting Rights Act of 1965 or the Civil Rights Act of 1964 prohibits a state from requiring absentee voters to prepare their ballot in front of a witness. Neither side cites any evidence regarding the effectiveness of the witness requirement in preventing abuses or the number of citizens who cannot vote because of the requirement. But regardless of how effective or burdensome the requirement is, the federal laws at issue in this case simply do not apply to it.

The court reiterates its view that the judgment in this case will have no effect on the judgments in *Priorities USA* or *League of Women Voters* or on the injunction in *League of Women Voters*, regardless of how those cases are resolved on appeal. More specifically, this order does

not preclude the Dane County Circuit Court from enforcing its order invalidating the requirement in § 6.87 for witnesses to include their address on an absentee-ballot envelope, nor does this order relieve defendants from complying with the state court's order.

## ORDER

IT IS ORDERED that:

1. Plaintiffs' motion for leave to respond to the Wisconsin Legislature's notice of supplemental authority, Dkt. 101, is GRANTED, and the brief attached to the motion is accepted.

2. Plaintiffs' motion for summary judgment, Dkt. 63, is DENIED.

3. The motions for summary judgment filed by the commissioners, Dkt. 58 and the legislature, Dkt. 64, are GRANTED. On the court's own motion, summary judgment is GRANTED to the municipal clerks.

4. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered May 9, 2024.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge